```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF DELAWARE

 3

 4    GENENTECH, INC. and INTERMUNE,   )
      INC.,                            )
 5                                     )
                      Plaintiffs,      )
 6                                     ) C.A. No. 19-078-RGA
      v.                               ) (Consolidated.)
 7                                     )
      AUROBINDO PHARMA LIMITED, et     )
 8    al.,                             )
                                       )
 9                    Defendants.      )

10

11
                           Wednesday, September 23, 2020
12                         9:33 a.m.
                           Markman Hearing Videoconference
13

14    BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

15    APPEARANCES:

16              MORRIS NICHOLS ARSHT & TUNNELL LLP
                BY:  KAREN A. JACOBS, ESQUIRE
17              BY:  CAMERON P. CLARK, ESQUIRE

18                      -and-

19              LOEB & LOEB LLP
                BY:  MARK E. WADDELL, ESQUIRE
20              BY:  RYAN HAGGLUND, ESQUIRE

21                            For the Plaintiffs

22

23

24

25
```

1    APPEARANCES CONTINUED:

2                    BAYARD, P.A.
                     BY:  STEPHEN B. BRAUERMAN, ESQUIRE
3
                              -and-
4
                     GOODWIN PROCTER LLP
5                    BY:  NATASHA E. DAUGHTREY, ESQUIRE
                     BY:  EMILY RAPALINO, ESQUIRE
6                    BY:  NICHOLAS K. MITROKOSTAS, ESQUIRE

7                                  For the Defendants

8                         ***   PROCEEDINGS   ***

9            THE COURT:  All right.  Assume if I see her

10   she's not special and I will see the others pretty soon Lee,

11   am I all right?

12           THE COURT:  All right.  So okay.  Now, I see

13   Mr. Brauerman, so we're starting to make progress here.  All

14   right.  So my deputy clerk is on the line.  My court

15   reporter is on the line.

16           And this is *Genentech vs. Aurobindo*,

17   Consolidated Civil Action Number 19-78.  And from the looks

18   of things I would say somebody from Morris Nichols

19   represents the plaintiff.

20           Who's on the line for the plaintiff?

21           MS. JACOBS:  Good morning, Your Honor.  This is

22   Karen Jacobs and Cameron Clark from Morris Nichols.  And we

23   have on the line with us Mark Waddell and Ryan Hagglund from

24   Loeb & Loeb, and Mr. Waddell will be presenting today.

25           THE COURT:  All right.  Thank you.

1          And for the defendant, who's going to be making

2    the presentation?  Who's the Delaware attorney?

3          MR. BRAUERMAN:  Good morning, Your Honor.  Steve

4    Brauerman.  (Inaudible.)

5          THE COURT:  All right.

6          DEPUTY CLERK:  Judge, we can't hear you for some

7    reason.  It doesn't look like you're muted, so I'm not sure

8    what's going on.

9          THE COURT:  There.  Can you hear me now?

10          DEPUTY CLERK:  Yes.  I can, too, Judge.

11          THE COURT:  All right.  So Mr. Brauerman, why

12    don't you try again.

13          MR. BRAUERMAN:  I apologize, Your Honor.  Steve

14    Brauerman.  I'm here --

15          THE COURT:  All right.  So Mr. Brauerman, mute

16    yourself.  Whoever your outside counsel is, can that person

17    speak up?

18          MS. DAUGHTREY:  Hi, Your Honor.  This is Natasha

19    Daughtrey from the law firm of Goodwin Procter.

20          Can you hear me okay?

21          THE COURT:  I can hear you fine.

22          MS. DAUGHTREY:  Great.

23          THE COURT:  I'm going to just assume -- All

24    right.  In any event, you are presenting on behalf of all

25    defendants; right?

1          MS. DAUGHTREY:  That's correct.  I'm presenting

2     on behalf of the defendants that have joined claim

3     construction.

4          THE COURT:  Which means everybody except for

5     Amneal or someone?

6          MS. DAUGHTREY:  Correct.  And I have two client

7     representatives that have also joined us.  That's Bill Carey

8     from Sandoz and Dan Forchheimer from Teva.

9          I also have my colleagues, Emily Rapalino and

10    Nick Mitrokostas on the line as well.

11         THE COURT:  Okay.  All right.  Does anybody else

12    want to put on the record that they're here?

13         All right.  I'm satisfied that we've got the

14    people we need.  So Mr. Waddell and Ms. Daughtrey, have you

15    all communicated to each other as to which order you were

16    going to go in here.  Normally plaintiff goes first.  The

17    party with the dog goes second.  But on the other hand,

18    generally when we're talking about indefiniteness, sometimes

19    the defendant goes first.

20         Did you all talk about this to each other?

21         MS. DAUGHTREY:  No, Your Honor, we haven't

22    discussed that.  We'd be happy to take it in whatever order

23    Your Honor prefers.

24         THE COURT:  Mr. Waddell.

25         MR. WADDELL:  No, we haven't discussed it, Your

1    Honor, but if it's okay with my opposing counsel,

2    Ms. Daughtrey, I could go first from the plaintiffs'

3    standpoint just presenting our claim construction argument

4    and stop short of responding to any of the indefiniteness

5    defenses since I understand defendants don't really want to

6    offer argument on claim construction.  They just want to

7    offer argument on indefiniteness.

8              If that's okay, I would just do a brief opening

9    presentation of our position, and then I could reserve time

10   and come back later and respond.

11             THE COURT:  So is that right, Ms. Daughtrey,

12   that though, if I'm not persuaded of the indefiniteness,

13   then you're not really arguing what's the proposed claim

14   construction?

15             MS. DAUGHTREY:  That's correct, Your Honor.  We

16   believe that the claims are not amenable to any particular

17   construction and that they're indefinite.

18             THE COURT:  Okay.  All right.

19             Well, then let's do this:  Mr. Waddell, you can

20   go ahead for like five minutes, which should be enough, and

21   then I'll turn over to Ms. Daughtrey, and she can have up to

22   20 minutes.  And then you can have 15 minutes in response or

23   something like that.

24             Okay?

25             MR. WADDELL:  Of course, Your Honor.  And I'm

1   going to -- I think I understand how to share the screen, so

2   let me see if this will work.

3                THE COURT:  All right.

4                MR. WADDELL:  Power-point file.  We tried this

5   out yesterday, and it took a minute or two for files to

6   load.  So I apologize for the delay, Your Honor.

7                THE COURT:  Well, that's all right.  There's a

8   certain amount of delay that's inherent in this method of

9   presentation and so do not -- I may get impatient about this

10  or that, but I won't get impatient just because it takes a

11  minute for your power-point to load or if we have other

12  technical difficulties, because I do believe they are beyond

13  anyone's control.

14               MR. WADDELL:  All right.  It says it's uploading

15  now.  What I could do just while I'm waiting for that to

16  upload, there's a little bit of dead space, but I'd like to

17  just give some brief background on what the invention is

18  about and just set the table for what I think the issue is

19  today.  And within that five-minute time frame, I'll, of

20  course, offer our position.

21               So the inventions that we're talking about

22  concern treatment of the disease called idiopathic pulmonary

23  fibrosis.  It's abbreviated IPF.  IPF is an irreversible and

24  ultimately fatal disease.  It's characterized by progressive

25  loss of lung function due to the fibrosis.  That's scarring

1    in the lungs.  It hinders the ability of the lungs to absorb

2    oxygen and there -- here we are.  See if it will -- how do

3    we do this?  Oh, okay.

4              So at the time --

5              THE COURT:  I'm sorry.  Let me just interrupt to

6    say that I have read the brief that was submitted, and I did

7    review, perhaps even read the patent in question.

8              MR. WADDELL:  Perfect.

9              THE COURT:  So I have some background here.

10             MR. WADDELL:  Very good.  So I'll skip to the

11   patents that we're concerned with and how this relates to

12   the case.  The infringement issue in the case is going to

13   focus primarily on drug labeling, and I have up on the

14   screen an excerpt from the drug labeling.  This is

15   information that the FDA requires.  And when we get to the

16   infringement part of the case, we'll be talking about this

17   in the context of infringement.

18             And you can see I highlighted at the bottom

19   there the labeling talks about dosage modification or

20   interruption may be necessary for liver enzyme elevations.

21   So that's -- how does this work?  Ah, there we are.

22             So Your Honor's read the briefs.  These are the

23   disputed claim constructions.  Plaintiff offers the one on

24   the left.  Defendants offer nothing.  They want to argue

25   indefiniteness.

1          And I'll briefly focus on the wording of the

2    claims.  This is claim 1 from the '729 patent.  This was the

3    first patent granted to Intermune for the inventions made

4    during the clinical development of the compound.  This is

5    the first claim of the first patent.

6          And you can see that it's directed to treating

7    IPF patients, and it has a clause in the middle, said

8    patient having exhibited, and then the wording that I've

9    highlighted there, is a Grade 2 abnormality in one or more

10   biomarkers of liver function.  So that's the phrase that we

11   came to agreement with defendants that we'd be briefing for

12   claim construction.

13         And how do I move forward?  Okay.  Specification

14   of the patent.  Again, this patent relates to modifying

15   treatment for patients with atypical liver function.  This

16   relates back to that information in the labeling.  And

17   plaintiffs' position is that if we went back to the disputed

18   claim phrase, it's talking about Grade 2 abnormalities.  And

19   the inventors in column 7 of this patent, Exhibit 1, they

20   use the words adverse effect grades.

21         First, they said adverse effect grades for

22   abnormality liver function are defined herein by, and then

23   they cite established criteria that were developed and

24   published by the National Cancer Institute.  The inventors

25   incorporated the information from those common toxicity

1    criterion into a table.

2              And you can see, this is Table 1 in the patents.

3    And the word toxicity, there are highlighted the five

4    biomarkers that the inventors included in this table.  And

5    then over in column -- well, it's the fourth column, but

6    under two, you see ranges there.  Each refer to ranges above

7    an upper limit of normal.

8              And so what this means is that if you're running

9    blood tests on a patient, certain blood parameters -- you

10   know, when I go for a physical, I get my blood test, and it

11   tells me what was looked at.  It tells me what the normal

12   range is and whether I'm above or low for things like

13   cholesterol, for example.  And what this is talking about is

14   significant multiples, two-and-a-half times, up to five

15   times the upper limit of normal for each of these specific

16   markers.

17             And then we go over a little further down in the

18   columns, they're paragraphs -- if I go back, so there were

19   grade zero, one, two, three, and four.  The claim only

20   focuses on Grade 2, and the paragraphs beneath that are

21   where the inventors write what each of those grids include.

22             So we have Grade 2 liver function abnormalities

23   include, and then it lists them all.  So this is what we

24   point to as what the inventors intended by that adverse

25   experience toxicity grading limitation that they put in the

1    claim.

2              We briefly also covered the prosecution history.

3    This is some prior art concerning developments in Japan, and

4    the examiner in granting this patent wrote this paragraph

5    that we quoted.  The highlighted language is actually

6    italicized by the examiner himself meaning that this is the

7    same phrase that we're construing.  We submit that the

8    examiner clearly focused on that phrase.  He would have read

9    the patent, and he would have read the specification in

10   accordance with patent prosecution practice as examiners.

11   And we submit that this just adds further evidence that the

12   examiner clearly understood what this phrase meant since he

13   was relying on it to grant the patents.

14             I'm going to stop there.  If Your Honor has any

15   questions about what I said, I'm happy to cover them.  But

16   otherwise, I'll reserve time to respond to the

17   indefiniteness.

18             THE COURT:  All right.  Well, I do have a

19   question or two, but I think it would be better to hear from

20   Ms. Daughtrey first.  So thank you for that.

21             Ms. Daughtrey, it's your turn.

22             MS. DAUGHTREY:  Thank you, Your Honor.  Let me

23   just take over as presenter and see if I can get --

24             MR. WADDELL:  Yeah, I'm pressing stop and --

25   there, you should be in it now.

1          MS. DAUGHTREY:  Great.  Thank you.

2          All right.  Let me see here.

3          THE COURT:  So Ms. Daughtrey, while you're

4     getting the screen up, I was curious whether -- because as I

5     understand it, there's three or four patents that claim the

6     method that is, I guess, implicated by the FDA label.  And

7     there's certain asserted claims that are mentioned in the

8     brief as the ones that are at issue.

9          Are there other asserted claims relating to the

10    method that are not implicated by this indefiniteness

11    challenge?

12         MS. DAUGHTREY:  Yes, Your Honor, that's correct.

13    And can you see my screen right now?

14         THE COURT:  I can.

15         MS. DAUGHTREY:  Okay.  Great.  So there's some

16    agreed-upon constructions that are -- so there are claims

17    that are not impacted by the indefiniteness argument.  These

18    claims that I have up here on the board, as you can see,

19    they specify what Grade 2 abnormality in one or more

20    biomarkers of liver function are required to satisfy the

21    claims.  So even if Your Honor finds the disputed term

22    indefinite, it would not impact these claims.

23         THE COURT:  Well, and so because I assume this

24    does relate eventually to infringement, the claims that

25    you're asserting of indefiniteness, if they're gone, are you

1    getting some advantage in terms of defending against

2    infringement that you won't have if they remain?

3              MS. DAUGHTREY:  Your Honor, I think this would

4    just narrow the claims in dispute, but it wouldn't -- I

5    don't think this would impact an indefiniteness finding on

6    the disputed claims.  It wouldn't impact the infringement

7    analysis in general, no.

8              THE COURT:  So, and I don't mean to be -- so

9    basically, in your view, this is essentially immaterial to

10   the eventual shape that this case will have?

11             MS. DAUGHTREY:  I wouldn't agree with that, Your

12   Honor, because I do think that understanding the scope of

13   the claims in terms of demonstrating obviousness, you know,

14   it's important for the parties to understand what the scope

15   of the claims are for obviousness purposes.  And I do think

16   it would be material in terms of reducing the issues that we

17   have to present at trial.

18             But if your question is whether it's

19   dispositive, that's -- it's not dispositive, that's correct,

20   as to, you know, all of the issues in the case.

21             THE COURT:  Well, no, I knew it wasn't

22   dispositive as to all the issues in the case.  But what I

23   was really wondering, and I think you understand this, is

24   whether it actually could be the difference between your

25   winning and losing the case overall.

1          MS. DAUGHTREY:  I mean, I guess if these were

2    the only claims that remained at trial, it could make the

3    difference between winning or losing the case altogether.

4          THE COURT:  Well, so I meant really something

5    different which is, as you say, you have these other claims

6    that are part of a method that are from these patents and

7    which you're not arguing are indefinite.  And I guess what I

8    was trying to ask is I guess whether there's a function

9    going on here that's beyond just reducing the number of

10   asserted claims if I say that these ones are indefinite.

11         MS. DAUGHTREY:  I think Your Honor might be

12   referring to a circumstance sometimes where the claim

13   construction finding, you know, helps with some other aspect

14   of the case.

15         THE COURT:  No, no, no.  Actually, maybe I'm

16   talking too circularly here.  Does this make any difference?

17         MS. DAUGHTREY:  It makes a difference in terms

18   of narrowing the issues, but it doesn't otherwise make a

19   difference in the remaining asserted claims, if that's

20   helpful.

21         THE COURT:  Well, it's kind of helpful.  Well,

22   I'll give Mr. Waddell a chance when it's his turn.  Maybe

23   I'm -- but any way, go ahead.

24         MS. DAUGHTREY:  Okay.  Thank you, Your Honor.

25              So what I wanted to start with was what

1    plaintiffs turn to as the alleged definition -- sorry, let

2    me -- I'm going to skip around a little bit.  Plaintiffs

3    have pointed to this section of the patent specification as

4    being definitional.  And I think Mr. Waddell said that this

5    defines adverse effect grades for biomarkers of liver

6    function, but it actually doesn't have that phrase at all.

7    It doesn't have the disputed phrase in it.  It refers to

8    adverse effect grades for abnormal liver function and the

9    disputed term actually doesn't appear anywhere in the claims

10   in the patent specification.

11            And so here when it's talking about the adverse

12   effect grades, Your Honor, it's actually referring to the

13   grading system that's used and not limiting it to the

14   biomarkers that would be within the scope of the claims.

15   And so, you know, as an initial matter, the patent does not

16   define the disputed term and the plaintiffs' construction is

17   actually inconsistent with the rest of the specification,

18   and so it can't be the correct --

19            THE COURT:  Well, so before you get there,

20   Ms. Daughtrey, the common toxicity criteria that comes from

21   the common terminology criteria for adverse events,

22   published by the National Cancer Institute, do they have

23   similar grades, zero through four, for the other tests that

24   are vaguely related to liver -- the things that appear in

25   this 24 panel of chemical tests that are typically run?

1          MS. DAUGHTREY:  Yes, Your Honor.  And on slide

2    22 here, you can see this is from the CTCAE which is

3    incorporated by reference into the specification.  It lists

4    albumin, which is not one of the tests that's referred to in

5    the patent, and it has a Grade 2 rating for an abnormality

6    in albumin.  It's the same.  So it has the, you know, five

7    tests that are referenced in Table 1, plus a bunch of

8    additional ones.  And they all have Grade 2 ratings as well

9    in the CTCAE.

10         THE COURT:  And so, for example, going down

11   five, I see cholesterol.  Well, does cholesterol have

12   anything to do with the liver?

13         MS. DAUGHTREY:  Yes, Your Honor.  The CTCAE has

14   a lot of other tests, but these are the ones we've

15   identified are the ones that are specific to the liver.

16   They indicate liver function.

17         THE COURT:  Okay.

18         MS. DAUGHTREY:  And it's not just the CTCAE that

19   talks about these other liver function tests.  You know,

20   several of the references incorporated into the patent

21   specification, the Abboud 2007 reference, the Tajiri

22   reference, they also refer to albumin, cholesterol, glucose,

23   these other tests that are indicative of liver function.

24         THE COURT:  Okay.  Sorry.  Go ahead.

25         MS. DAUGHTREY:  Yeah.  The next point I'd like

1    to turn to, Your Honor, was Mr. Waddell focused on the

2    prosecution history of the patents.  And just briefly on

3    that point, the argument that the patentee was making during

4    prosecution was that the prior art didn't disclose

5    monitoring or reducing the dosage based on hepatic adverse

6    events.  They never made a distinguished -- an argument

7    distinguishing the biomarkers of liver function in the prior

8    art versus the biomarkers of liver function in the patent.

9    And the examiner never made any findings as to which

10   biomarkers of liver function would be included within the

11   claims.

12           So the prosecution history of these patents

13   doesn't really shed light on this issue.  And I'd like to

14   turn back to the specification as a whole.  Mr. Waddell

15   started with the one sentence at Table 1 that they assert as

16   definitional, but when you look at the patent specification

17   from the beginning to the end, it makes it clear that the

18   five tests in Table 1 are not the limitations of the claim.

19   And it's really unclear what the limitations of the claim

20   are.

21           So on slide 15, I have here some of the first

22   references in the patent to ALT, AST, bilirubin, ALP and

23   GGT.  And I'm just going to use the abbreviations for those.

24   I think Your Honor's familiar with what the longer term is

25   for those, but if you have any questions, let me know.

1          THE COURT:  I'd prefer you use the

2     abbreviations.

3          MS. DAUGHTREY:  I understand.  So every time the

4     specification refers to these tests, it refers to them in a

5     non-limiting way.  It says an abnormal liver function may

6     manifest as abnormalities in levels of biomarker, including

7     ALT, AST, bilirubin and/or ARP.  Then it refers to some

8     embodiments having the biomarkers of liver function be ALT,

9     AST, bilirubin, and ALP.

10          In fact, at column 6, this is the last box on my

11     slide, it says examples of biomarkers of liver function

12     include, but are not limited to and then lists those five.

13     And in fact, when explaining more about GGT, the patent says

14     that elevated GGT has been observed in some patients

15     receiving Pirfenidone without any clinical impairment, so

16     elevated GGT alone is not necessarily a sign of liver

17     impairment.

18          Then it states in any of the embodiments

19     described herein, biomarkers of liver function can exclude

20     GGT.  This sentence is directly contrary to what plaintiffs

21     assert is the definition of the disputed term.

22          THE COURT:  Well, aren't there some claims that

23     do exclude GGT?

24          MS. DAUGHTREY:  There are some claims where

25     the -- and those are the claims that are not disputed.

1    There are some claims that specify the biomarker liver

2    function that would be ALT and AST.

3          THE COURT:  Right.  And isn't there one -- I

4    thought I saw one that looked more or less like a Markush

5    group that included everything but GGT.

6          MS. DAUGHTREY:  I think that's right, Your

7    Honor.

8          THE COURT:  So you know, I mean, so I guess

9    saying, well, the specification says embodiments, after all

10   we're not construing embodiments, that it can exclude GGT.

11   And then having some claims where GGT is excluded, you know,

12   I don't know, that doesn't strike me as very compelling for

13   much of anything.

14         MS. DAUGHTREY:  So Your Honor, if it said in

15   some embodiments described herein, GGT can be excluded from

16   biomarkers of liver function, that would be maybe more

17   consistent with some of the dependent claims.  But here, it

18   says in any of the embodiments.

19         THE COURT:  Right.  But even then, you don't

20   have to have an embodiment for -- you can claim stuff where

21   you haven't shown an embodiment; right?

22         MS. DAUGHTREY:  Yes, Your Honor.  That's

23   correct.  And the real crux of the issue here is that a

24   person of skill in the art would not know when GGT was

25   within -- inside the claims or outside the claims.  And it's

1    important to remember that the disputed term is one or more

2    biomarkers of liver function.  So it can include when there

3    is just one biomarker of liver function that is elevated

4    with a Grade 2 abnormality.

5              And so because the patent states that, anywhere

6    you can exclude GGT as a biomarker of liver function, you

7    wouldn't know when GGT alone would fall within the scope of

8    the claims.

9              THE COURT:  All right.  Go ahead.

10             MS. DAUGHTREY:  Thank you, Your Honor.

11             So in cases such as this where there is

12   inconsistent use of a term in the specification that make it

13   so a person of ordinary skill in the art can't understand

14   the boundaries of a claim, that renders the claim

15   indefinite.

16             And I just want to turn to another section of

17   the specification that gives some more explanation for the

18   ALT, AST, bilirubin, ALP.  There are paragraphs in the

19   specification that elaborate on some of these biomarkers of

20   liver function, and it has a whole paragraph explaining how

21   they're indicative of liver impairment.

22             There's no paragraph like this for GGT in the

23   specification which further leads to confusion as to whether

24   GGT is included in or outside the scope.  And also, when

25   it's referring to AST, and I'm on slide 18, the bottom left

1    box that I have up here says the ratio of AST to ALT can be

2    used as a biomarker of liver damage.  And so this adds an

3    additional biomarker of liver function or liver damage.

4               THE COURT:  So Ms. Daughtrey, I'm still on slide

5    16 on my screen.  Where in the specification does it have

6    this phrase about the ratio of AST to whatever the other one

7    was?

8               MS. DAUGHTREY:  AST to ALT.  Can you see slide

9    18 right now?

10              THE COURT:  No, I'm looking at 16.

11              MS. DAUGHTREY:  Let me see.

12              THE COURT:  Does it have a citation on it to

13   wherein the patent?  Because I looked for that because you

14   had said it in the brief, but I didn't --

15              MS. DAUGHTREY:  Yes, Your Honor.  So that's at

16   column -- here, let me just -- I have a broader citation.

17   Let me pull up this broader citation here.

18              It's between columns 6 and 7 of the '729 patent.

19   So this would be --

20              THE COURT:  Oh, I see it.

21              MS. DAUGHTREY:  -- 7, lines 3 through 4.

22              THE COURT:  Okay.

23              MS. DAUGHTREY:  It shows AST to ALT can be used

24   as a biomarker of liver damage.

25              THE COURT:  I see.  Is there anything in the

1    National Cancer Institute grading system that gives grades

2    for the ratio of AST to ALT?

3              MS. DAUGHTREY:  Let me just go to my slide on

4    that, Your Honor.  I don't believe that that's identified in

5    the CTCAE as one of the metabolic function -- liver function

6    tests.

7              THE COURT:  All right.  So one of the kinds of

8    disputes that I thought I saw between you and the other side

9    was, you know, their view was you should be looking at the

10   whole claim term, you know, which starts with a Grade 2

11   abnormality.  And they said you were looking too narrowly at

12   just biomarker or biomarker of liver function.  And that the

13   context of the whole phrase helps them, and that you were

14   ignoring that.

15             What do you have to say about that?

16             MS. DAUGHTREY:  Your Honor, the disputed term

17   was raised in the context of plaintiffs first raised Grade 2

18   abnormality as a disputed term.  Defendants responded by

19   saying, well, you know, biomarkers of liver function is

20   indefinite, and so the parties agreed to construe the entire

21   phrase.

22             Given kind of what plaintiffs' argument that

23   they're making, we agree that the Court should construe the

24   entire phrase.  And we don't believe that -- you know, we

25   are not ignoring the first half of the definition and only

1    focusing on one or more biomarkers of liver function.  We --

2    I think it's clear from the patent specification that Grade

3    2 is referring to the grading system in the CTCAE.  I don't

4    think that that's in dispute here.

5             But the question is:  What biomarkers of liver

6    function are included within that?  And it's just not clear

7    based on the specification language itself and all of the

8    references that are incorporated into it.

9             THE COURT:  Well, so if it turned out to be the

10    case that the specification makes clear that there's only

11    five Grade 2 markers that they're interested in, that the

12    specification of the patent is interested in, wouldn't that

13    sort of flow through, meaning those are the only five

14    biomarkers we're talking about?

15             MS. DAUGHTREY:  And Your Honor, I just restarted

16    my screen to see if that fixes the issue.  Can you --

17             THE COURT:  It's loading.

18             MS. DAUGHTREY:  Okay.  So Your Honor, no, I

19    don't think that would fix the issue.  First of all, it is

20    not able -- you're not able to reconcile Table 1 with other

21    statements in the patent specification.

22             The other issue that there are portions of the

23    claims that refer to resuming the dose of Pirfenidone when

24    biomarkers of liver function return to normal, so it uses

25    slightly different language than Grade 2 abnormality in one

1    or more biomarkers of liver function.  And so a person of

2    skill in the art still wouldn't know which biomarkers of

3    liver function have to return to normal to resume.

4              THE COURT:  So Ms. Daughtrey, the terms that

5    just talk generally about biomarkers of liver function like

6    you've just said, presumably they're -- oh, so I think I

7    looked at this because in your briefing some places where it

8    says biomarkers of liver function, it seems to be, though

9    it's not done in the style that it should be, that that's

10   just referring to the -- that, you know, the earlier terms,

11   the antecedent basis arguably.  Are there any standalone

12   uses of the phrase, you know, return to or, you know, until

13   biomarkers of liver function are within normal limits?

14             MS. DAUGHTREY:  The patent specification uses

15   inconsistent language in the examples about what has to

16   resume to normal to increase the dosage of Pirfenidone.  So

17   the specification doesn't provide further context on that,

18   Your Honor.  And because -- and the biomarkers of liver

19   function alone, I don't think there is an antecedent basis

20   for this in the earlier claims.  That's not the way I would

21   read the claims.

22             THE COURT:  Well, because I am now seeing slide

23   28, if for example, claim 2 said the method of claim 1

24   wherein prior to step A Pirfenidone is discontinued until

25   the biomarkers of liver function are within normal limits,

1    would you be saying, yeah, okay, no problem there?

2          MS. DAUGHTREY:  Correct, Your Honor.  That's

3    exactly right.

4          THE COURT:  And yeah.  I mean, okay.  That's

5    kind of what I thought.  But I mean, that seems like maybe a

6    different claim construction issue than the one that we're

7    dealing with now or there's a claim construction issue there

8    that I would have to decide to give this argument any weight

9    which is really whether or not the until biomarkers of liver

10   function, which seems to me are clearly meant to refer back,

11   you know, whether there is an antecedent basis problem or

12   there's an antecedent basis problem that I can fix.  Because

13   it does seem to me pretty clear as to what the reference is

14   supposed to be.

15         In any event, go ahead.

16         MS. DAUGHTREY:  Your Honor, just briefly on

17   that.  As I mentioned earlier, the claims encompass one or

18   more biomarkers of liver function.  And so an additional

19   reason why this is not clear is because the claim 1 could

20   include a situation where there's a single biomarker of

21   liver function that it has a Grade 2 abnormality, and then

22   claim 2 refers to until biomarkers of liver function are

23   within normal limits.  And it's simply not clear how a

24   person of skill in the art would know what they should be,

25   you know, whether they would infringe the claims if some

1    biomarkers of liver function are within normal limits or

2    only the one that was elevated is back within normal limits.

3              And Dr. Thannickal also discussed that

4    biomarkers, other than these five that are in Table 1, can

5    be abnormal and impact the decision whether to resume a

6    dosage of a drug that is suspected of causing a drug-induced

7    liver injury.  And the patent simply doesn't address that

8    kind of real-life application.  And so, again, a person of

9    skill in the art practicing this in the real world simply

10   wouldn't know whether they infringe the claims which is kind

11   of the hallmark of indefiniteness here.

12             THE COURT:  Okay.

13             MS. DAUGHTREY:  And --

14             THE COURT:  I'm sorry.  I was curious about one

15   thing because I'm easily distracted.  What is the origin of

16   why the doses are 2,400 milligrams a day or 2,403 milligrams

17   a day?

18             MS. DAUGHTREY:  I don't know if I can answer

19   that, Your Honor.  The patentee -- I mean, I would say that

20   that was an arbitrary choice --

21             THE COURT:  Okay.

22             MS. DAUGHTREY:  -- to avoid obviousness, but --

23             THE COURT:  Yeah, not a very good way of

24   avoiding obviousness, but okay.

25             All right.  So your time is nearly up here.

1    What else would you like to make sure that I understood?

2             MS. DAUGHTREY:  Your Honor, I think one thing

3    that I just want to make clear is that plaintiffs

4    predominantly rely on this argument that there's a

5    definition in the specification, but in their reply papers

6    they argue for the first time that this is actually just a

7    plain and ordinary meaning, and everyone would know what

8    this term means.

9             And when you look at the intrinsic evidence to

10   the patent, that's simply not true.  These are the

11   references I have up here on slide 31.  Can you see it?

12            THE COURT:  Yes.

13            MS. DAUGHTREY:  Great.  These are the references

14   that -- some of the references that are incorporated into

15   the specification, and each of these have different examples

16   of biomarkers of liver function or liver function tests that

17   can be used to determine whether there's a drug-induced

18   liver injury.  And it's just clear that across the board, it

19   varies depending on which clinician, you know, what

20   patients -- the patient history.

21            And plaintiffs here are trying to, you know,

22   have an exclusive monopoly on an invention, and the

23   invention is supposed to be that you know when to be able to

24   reduce Pirfenidone in an IPF patient and when to resume

25   treatment.  And plaintiffs are not entitled to that unless

1      they tell you the clear boundaries of the scope of the

2      claims.

3                      And the intrinsic record here just has

4      contradictory definitions and contradictory examples of

5      biomarkers of liver function are.  And so a person of skill

6      in the art would not be able to tell with reasonable

7      certainty how -- you know, whether they were infringing the

8      claims.

9                      THE COURT:  Okay.  Thank you.

10                     I'll give you a couple minutes when Mr. Waddell

11     is finished to respond to his most outlandish arguments.

12     Okay?

13                     MS. DAUGHTREY:  Thank you, Your Honor.

14                     THE COURT:  All right.  Mr. Waddell, your turn.

15                     MR. WADDELL:  All right.  Your Honor, let me get

16     the power-point up again.  There we go.

17                     Okay.  That's loading.  So while we're waiting

18     for that, I can address the questions that Your Honor began

19     with about materiality to the eventual shape this case will

20     have.

21                     THE COURT:  Yes.

22                     MR. WADDELL:  Those are questions that we have

23     as well.  We framed ours a little differently in the form of

24     contention interrogatories.  There is a dispute regarding

25     responses to those that has not yet been presented to the

1    Court; therefore, I don't think it's proper for me to go

2    further into that, just to acknowledge that plaintiffs have

3    the same questions concerning why defendants are fighting

4    about these claims.

5            THE COURT:  Okay.  Thank you.

6            MR. WADDELL:  All right.  The slides are up.

7            THE COURT:  Yes, they are.

8            MR. WADDELL:  I'd also just briefly address the

9    question about the dose because I know that's bothering Your

10   Honor.

11           THE COURT:  Well, it's not so much bothering,

12   but it's just the oddest thing I've ever seen.

13           MR. WADDELL:  Yeah, the reason -- when the

14   clinical trials began way back when, the actual physical

15   embodiment of the drug that they had on hand was a capsule.

16   Capsules come in certain sizes.  And this particular capsule

17   filled to a weight of 267 milligrams.  So in order to have

18   new data that Intermune was developing be able to be

19   reviewed, along with old data that existed for the drug, you

20   had to keep using the same dose.  So 267, if you do a

21   multiple of that and triple, that's 801 milligrams.  And the

22   dosing of this drug was three times a day, so that adds up

23   to 2,403.

24           THE COURT:  Okay.  Yeah, I couldn't figure what

25   the relationship between 801 was.  Okay.  That satisfies my

1      curiosity.

2              MR. WADDELL:  All right.  So you can -- at least

3      that won't be bothering you in the back of your mind.

4              So the other point, Your Honor's quite right.

5      We've got a dispute over what the dispute is about.  We're

6      saying that the dispute for today concerns a claim

7      construction issue about this entire phrase which is

8      focusing on the diagnostic method used for determining

9      whether patients -- and let me go to the claim -- whether

10     patients have a Grade 2 abnormality.

11             Now, we contend that the five criteria for Grade

12     2 that are presented in Table 1 that come out of that CTC

13     National Cancer document are the ones that the inventors

14     clearly intended to cover.  If defendants had wanted to

15     present an alternate claim construction argument saying,

16     hey, wait a minute, there are a few more biomarkers in that

17     list that should be added, that's a claim construction

18     issue, and we'd only be discussing whether the claim should

19     be broader in light of defendant's argument or whether it

20     should be construed the way plaintiffs say.

21             That's not an indefiniteness argument.  It's

22     just a claim construction argument.

23             And let me just jump ahead.

24             THE COURT:  So --

25             MR. WADDELL:  Yeah.

1            THE COURT:  So Mr. Waddell, I mean, one way to

2    understand your argument, which may or may not be the way

3    that you have intended it, is when you say the is defined by

4    discussion of Grade 2 abnormalities is definitional, what

5    you're actually saying or is that there's five Grade 2

6    abnormalities which are in Table 1, and they're the only

7    five that are at issue.  So the fact that biomarkers of

8    liver function could include lots of other things or at

9    least some other things is kind of irrelevant because the

10   only five that are at issue are the five that are in this

11   table.

12            MR. WADDELL:  That's correct, Your Honor.  And I

13   could mention one of the examples of the extras that got

14   left off this list.  Defendants raised this albumin.  And to

15   address that, plaintiffs submitted in their reply position,

16   they submitted an expert declaration from Dr. Steven Nathan

17   where he addresses that.

18            Dr. Nathan confirmed that the five biomarkers

19   listed in Table 1 are what clinicians use.  They're the

20   biomarkers he uses to monitor his own IPF patients.  And he

21   mentioned the reason albumin or albumin, I don't know how to

22   pronounce it, is not used in this context is that it's not

23   specific.  It's indicative of a lot of other things,

24   including the fact that the patient has IPF.

25            Okay.  So Your Honor's quite correct, the way

1    the inventors wrote this, the claim contains that term Grade

2    2 which is an adverse effect grade.  And they say here in

3    column 7 of the patent that adverse effect grades are

4    defined herein by the CTC criteria provided at Table 1.  And

5    I think Your Honor understands that.

6           If I could analogize this.  If I booked a hotel

7    room and it says in-room breakfast is included.  I check in

8    the hotel.  I'd look at the breakfast menu that's on the

9    table, and I would assume that what's included is what's on

10   that list and nothing else.  I mean, this is the breakfast

11   menu, if you will, of what's included.

12          And they reinforce this point with their

13   paragraph -- whoops.  How did I do that?  It looks like I

14   jumped ahead too far, but they reinforced it.  The paragraph

15   defining Grade 2 liver function abnormalities where they use

16   the same five biomarkers and the same grades.

17   Two-and-a-half times up to five times the upper limit of

18   normal for four of them and then bilirubin one and a half to

19   three.

20          If I could jump ahead.

21          THE COURT:  Mr. Waddell, I take it what you're

22   showing by this slide right here, essentially what you're

23   saying is, though the specification uses slightly different

24   words, you know, biofunction or biomarkers of liver

25   function, that a person of ordinary skill of the art reading

1    this would understand this is really talking about the

2    concept that we're trying to construe today; right?

3                    MR. WADDELL:  That's right, Your Honor.  And I

4    should say we submitted Dr. Nathan's declaration, in part,

5    to address that very issue, how would a person skilled in

6    the art have read this patent.  And this is what he says.  I

7    mean, this is how he reads it in the clinic in his own

8    clinical practice.

9                    And in his view, the defendants in their

10   position and his colleague, Dr. Thannickal in his

11   declaration are just trying to introduce a lot of confusion

12   in what is actually a very clear, well-understood concept in

13   his view.

14                   Also, if I could jump ahead to some excerpts

15   there.

16                   THE COURT:  Actually, you know, Mr. Waddell, I

17   think --

18                   MR. WADDELL:  Yeah.

19                   THE COURT:  -- for one reason or another, I

20   might have actually looked at Dr. Nathan's declaration, and

21   it's possible I have something else in mind.  But I like the

22   way he kind of went back and forth from being a clinician to

23   being a lawyer.  So I usually tend to discount it when the

24   doctor also pretends to be a lawyer.

25                   MR. WADDELL:  I hear you, Your Honor.  And the

1   parts where he sounds like a clinician, obviously, are the

2   parts that he's putting out there.  The parts that sound

3   like a lawyer are the parts where he's informed by the

4   lawyers how these issues are framed legally so that he can

5   try and put his clinician confidence in the correct context.

6           THE COURT:  And you know, I say this not

7   directed at you because I see it all the time, but this is

8   the reason why most of the time I pay no attention at all to

9   expert declarations in Markmans is because, you know,

10  portions of them are so obviously just the lawyers getting

11  the doctor to sign something saying what the lawyers are

12  saying.  And that's just not helpful.

13          MR. WADDELL:  Yeah.

14          THE COURT:  You know, so I see it all the time.

15  It's something that seems to me irresistible to lawyers on

16  both sides and in patent cases, but you know, it's just not

17  helpful.

18          MR. WADDELL:  We'll take that criticism in the

19  spirit it's intended, Your Honor, and I agree with you.  I

20  wish we could have brought Dr. Nathan in to just explain

21  himself directly to the Court, but of course, you know, this

22  is not the time or the place for the Court to be hearing

23  from these witnesses.  I would just say that, you know, as

24  lawyers or lay people, you know, we can all go on the

25  Internet and try and self diagnose things, and I think that

1   just turns us all into hypochondriacs.

2          There's a reason why we have people with M.D.'s

3   after their name.  And I just put a little information up on

4   the screen about Dr. Nathan and his background.  He's

5   obviously qualified.  And I think if there are questions

6   that the Court has going to what people skilled in the art

7   actually view here and what they consider in reviewing this

8   patent, it would be best just to call him and let him

9   explain for himself.

10          THE COURT:  Well, I don't think that's going to

11   be necessary at this time, but I -- that is actually my

12   experience is that when you get experts who submitted

13   declarations that sound like the expert's a lawyer, most of

14   them when they're actually testifying sound a lot more

15   comfortable in whatever their area of expertise actually is.

16          But go ahead.  Let's move on.

17          MR. WADDELL:  Yeah.  Okay.  So let me just see.

18   I took some other notes of questions that were asked when my

19   colleague was discussing the difference, the different

20   explanations of preferred embodiments in the specification,

21   I think Your Honor understood that.  We don't construe

22   claims limited to the preferred embodiments.  There are some

23   dependent claims that do address these.

24          And let me jump ahead because Your Honor did ask

25   questions about other claims in the case.  So the claim we

1    began discussing, claim 1 of the '729 patent is followed up

2    by five dependent claims.  And these are all modifying the

3    dose modification step, step A, in the preceding claim.  You

4    do have to read the dependent claims together with the

5    independent claim.  Right.

6              THE COURT:  Yes.

7              MR. WADDELL:  And let me jump ahead to some that

8    are not disputed.  This is the first phrase not disputed.

9    So in this patent, the '462 patent, we're asserting claim 28

10   which depends from claim 26.  So claim 28 began as adjusting

11   the dose modification step of step A.  And here in claim 26

12   which is not disputed here, the claim phrase we agreed on is

13   a Grade 2 abnormality in one or both of ALT and AST.  These

14   are the acronyms for those two biomarkers after first

15   Pirfenidone administration.

16             So this claim where these or these two claims,

17   these are addressing a preferred embodiment where the

18   inventors are focusing now just on ALT and AST.  Okay.

19             But to understand again what this claim means,

20   Grade 2 abnormality again goes back to the grading system

21   which takes you to Table 1 in the patent where the inventors

22   provided the menu of biomarkers with established normal

23   limits and established Grade 2 elevations that they drew

24   from the document published by the National Cancer

25   Institute.

1          So we do have a fundamental dispute about

2     whether you need to read the entire claim phrase and not

3     just the last words in the claim in, the last words of --

4     the last words in the phrase.  It's like if you want to know

5     where a train is going, you go to the locomotive and ask the

6     engineer where he's heading.  You don't go to the caboose.

7          And so that, I think, leads to a lot of

8     confusion in the briefing as well because we can't even

9     agree on what I think we're arguing about.  Our position,

10    though, for purposes of claim construction is you read the

11    claim as a whole.  You read the claim phrase that is in

12    dispute as a whole.

13         I'll just put it up here from another claim.

14    Grade 2 abnormality in one or more biomarkers of liver

15    function, and you go back, and you read the patent.  You

16    read what the inventors intended.  And what they say they

17    intended is the menu they provided in Table 1.

18              THE COURT:  All right.  Are you done?

19              MR. WADDELL:  I can be, unless Your Honor has

20    questions.

21              THE COURT:  Okay.  No, I think I'm ready to give

22    Ms. Daughtrey the last word here.

23              Thank you, Mr. Waddell.

24              MS. DAUGHTREY:  Okay, Your Honor.  Let me just

25    put up my slides again.

```
 1                    THE COURT:  Sure.

 2                    MR. WADDELL:  I'm trying to push stop.  There we

 3       go.  How do I stop?  Can you get your slides up?

 4                    MS. DAUGHTREY:  Yeah, let me try.  It's about to

 5       go, I think.

 6                    MR. WADDELL:  Yeah, I apologize.  I just see

 7       mine and take over as presenter.  I don't want to push any

 8       buttons.

 9                    MS. DAUGHTREY:  Okay.  Can you see my slides

10       now?

11                    THE COURT:  It indicates they're loading.

12                    MS. DAUGHTREY:  Okay.  Let me just start with

13       one point, Your Honor.  Mr. Waddell referred to some of the

14       statements in Dr. Nathan's declaration about albumin and

15       what persons of skill in the art would understand to be, you

16       know, the five biomarkers of liver function.  And if you

17       look at Dr. Nathan's declaration, he doesn't cite anything,

18       especially not any contemporaneous evidence to support these

19       statements.  And in fact, there's contemporaneous evidence,

20       including evidence cited within the specification that

21       contradicts some of his opinions on that.

22                    Are you able to see my slides right now?

23                    THE COURT:  I am, Ms. Daughtrey.

24                    MS. DAUGHTREY:  Okay.  So I'm looking at slide

25       55, and this is the Abboud 2007 reference which is
```

1    incorporated into the specification.  And it lists albumin

2    as a liver function test.  And it also lists ALP, AST,

3    bilirubin and prothrombin time.  So the idea that albumin is

4    not used in clinical practice to determine whether there's

5    been liver function impairment is just not correct.

6           And then I'd like to turn to slide 38.  And this

7    other argument that Mr. Waddell referenced and that

8    Dr. Nathan made is that it's clear that the claims are

9    limited to these five tests because those are the ones that

10   are specific to the liver.  And albumin is not specific to

11   the liver.

12          But the patent itself refers to the fact that

13   some of the biomarkers of liver function are not specific to

14   the liver.  It says that GGT can be elevated without having

15   any liver impairment.  So it's not specific to the liver.

16   And AST can also result from damage to other sources.

17          It also refers to ALP as usually reflecting a

18   biliary tree disease which is not a liver function or not --

19   that means it's not specific to the liver.  And so the

20   intrinsic evidence contradicts this argument that only

21   biomarkers that are specific to the liver are included

22   within the claims.

23          I'd like to turn next to the breakfast analogy.

24   I think Mr. Waddell's analogy kind of misses the point.  The

25   better analogy would be that there's a breakfast menu, and

1    there's an asterisk that says Not all items listed below are

2    included in the breakfast package.  And so you wouldn't know

3    which ones are included or not.  You know, it might have a

4    list of, you know, pancakes, and sausage, and eggs, and OJ,

5    but you just don't know which ones are in there or not.  And

6    so I don't think that that analogy really is appropriate for

7    the claims here.

8              Finally, Dr. Nathan's opinions that these five

9    are the ones that everyone would just know, you know, what

10   they are when you say biomarkers of liver function, it means

11   the five at Table 1.  That's contradicted by Dr. Nathan's

12   own employers, the liver panels that they use.  It doesn't

13   just list the five.  It lists several others, including

14   albumin.

15             And I'm on slide 34 here.  Albumin, ALP, ALT,

16   AST, total protein, GGT and prothrombin time.  Dr. Nathan's

17   other employer, VCU Medical Center, and I'm now on slide 35,

18   again refers to albumin as a hepatic or liver function

19   panel, and then protein as an additional one.

20             And so, you know, Dr. Thannickal, I hope Your

21   Honor noticed that Dr. Thannickal actually provided

22   contemporaneous citations for his opinions, whereas

23   Dr. Nathan did not.  And I think that's a key distinguishing

24   factor between the two declarations, and so Your Honor

25   should discount Dr. Nathan's opinions in that regard.

1         And finally, on the argument that defendants are

2    somehow taking a portion of the claim and construing it in

3    isolation, defendants are not doing that.  The claim as a

4    whole is indefinite because even if you knew what Grade 2

5    meant, you wouldn't know the next phrase which is one or

6    more biomarkers of liver function.  The patent just provides

7    contradictory explanations for what is included within or

8    out of the scope of the claims.

9         And a final point on this, Your Honor, is that

10   the argument that there is a definition for the disputed

11   term, I don't think that even plaintiffs can dispute that

12   the disputed term is not in this definition.  It refers to

13   adverse effect grades for abnormality liver function.  It

14   doesn't say biomarkers of liver function.

15        And in other portions of the specification, I'm

16   on slide 43 here, when the patentee was defining a term, it

17   made it very clear which term it was defining.  So in the

18   top left corner on the slide here, at column 2, line 22, it

19   says, As used herein, original full target dose means and

20   they define it.  The patentee knew how to define words in

21   the claims, and that's consistent throughout the patent

22   specification.

23        And what plaintiffs point to as the definition

24   of the disputed term doesn't have a disputed term, doesn't

25   use the format that the patentee used throughout the rest of

1      the specification.  And the case law is clear that you have

2      to be very clear when you're defining a term for it to take

3      a definition that's contrary to the general understanding of

4      the term.

5                  THE COURT:  So Ms. Daughtrey, it seems to me

6      that you have to be right that you cannot -- it's pretty

7      hard to have lexicography of a term when you don't actually

8      even say what the term is.  But what about whether or not

9      the sentence adverse effect grades for abnormal liver

10     function are defined herein by the modified common toxicity

11     criteria, CTC, provided in Table 1 for what are the adverse

12     effect grades?  Doesn't that seem pretty definitional?

13                 MS. DAUGHTREY:  In terms of what grading system

14     you use, we wouldn't dispute that the specification is

15     telling the person of skill in the art what adverse effect

16     grading system they should use because there's multiple

17     grading systems.  But that just refers to --

18                 THE COURT:  But it's more specific than just

19     saying, you know, use the adverse effect grading system of

20     the National Cancer Institute.  It says the adverse effect

21     grades are provided in Table 1; right?

22                 MS. DAUGHTREY:  Correct, Your Honor.  But --

23                 THE COURT:  And --

24                 MS. DAUGHTREY:  Sorry.  Go ahead.

25                 THE COURT:  Well, and so isn't that pretty much

1    defining what the adverse effect grades are?  They're the

2    five grades that are listed in Table 1?

3                    MS. DAUGHTREY:  Your Honor, the Table 1 was

4    provided to give you the numerical range for some of the

5    biomarkers of liver function.  And the next sentence in this

6    definitional sentence of this definitional section of the

7    patent incorporates the entire CTCAE into the patent.  And

8    so you have to read the patent as if the entire CTCAE is

9    there, you know, for convenience sake, though don't include

10   the entire thing because it would be too long.  And they've

11   just included some of those, but the patent is not carving

12   out all of these other biomarkers of liver function that are

13   referred to in the CTCAE and any other references that are

14   incorporated into the patent specification like Abboud 2007.

15                   THE COURT:  All right.  Thank you,

16   Ms. Daughtrey.

17                   All right.  Well, thank you both, counsel.  I

18   found this helpful.  I'm going to take the question under

19   advisement.

20                   Do I have anything scheduled in this case any

21   time in the near future that involves me, or are we

22   basically now where I'm going to write something on this

23   claim construction, and the next time I'll hear from you is

24   when one or the other of you decides to spend some of your

25   client's money on Daubert motions?

1          MS. DAUGHTREY:  Your Honor, I'm just trying to

2   pull up the schedule.  I don't recall, off the top of my

3   head, if we have any other upcoming conferences with Your

4   Honor.

5          THE COURT:  Okay.  Well, I can look that up.

6   All right.

7          Well, so I'm going to sign off.  Thank you very

8   much for your time today and everyone take care.  All right?

9          MS. DAUGHTREY:  Thank you, Your Honor.

10          MR. WADDELL:  Thank you, Your Honor.

11          (Markman Hearing was concluded at 10:42 a.m.)

12          I hereby certify the foregoing is a true and

13   accurate transcript from my stenographic notes in the

14   proceeding.

15               /s/ Heather M. Triozzi
                 Certified Merit and Real-Time Reporter
16               U.S. District Court

17

18

19

20

21

22

23

24

25